May it please the Court, Glen Mertens for Plaintiff and Appellant, Hip Hop Beverage Corporation. As this case arises on the pleadings, we don't have to parse through a lot of summary judgment type evidence, as was the case with many of the cases referred to in the brief. I would note, though, that what makes this case different than the pleading cases referred to is the fact that, as part of our pleading in that First Amendment complaint, we make specific reference to evidence that was adduced in discovery in an earlier case against one of our master brokers, this Mid-Valley Company. That evidence, that deposition testimony, which is expressly pleaded in the First Amendment complaint, makes it quite clear that Monster is engaging in anti-competitive activity in its arrangements with the various brokers and sub-level brokers. Is that you're referring to them pressuring or talking people out of dealing with your client? Exactly. We pleaded. But does any of that previous pleading have anything to do with market share, loss of sales, things of that sort? Yes, it does. Any numerical way other than just saying Monster is a big company with a big share? Well, Your Honor, if you're asking does the First Amendment complaint attribute a specific percentage of the market to Monster, no, it does not. I'm not sure we know. Did it say you lost any particular amount of sales? Did it say what your sales were before and after? We do plead that as a result of losing four different brokers, we were reduced to doing nothing more than having our own personnel try to service the accounts that we had already been given these product codes for. That makes it virtually impossible for a small manufacturer such as Hip Hop to You don't give any numerical statement of that? No, no. The complaint is what it is. We do not plead specifically. And you do say that you did continue to make some sales. It was not that you were driven out of the market. You say you had to operate without brokers and so forth. In the First Amendment complaint, yes, that's what we pleaded. Since that time, we are out of the market. We have been driven out of the market. That's not in the complaint. No, I understand that. I understand that. But what the argument is for purposes of this pleading is that because we were reduced to nothing more than having our people try to service these various accounts, we could not increase our market share whatsoever. This just basically backs into the barriers to market penetration. It may not be 100% clear from the First Amendment complaint the way this military distribution system is set up, there are the commissaries, 257 commissaries, and over 3,000 of these mobile platforms that are administered through this exchange program. They sell these things out on aircraft carriers under a program called Ships Afloat under these exchanges. Without master brokers marketing the products to DECA and the exchanges, and then later having sublevel brokers assist in the inventory, the on-site sales, the merchandising display, whatnot, it is virtually impossible to increase sales. You may, as we did, get product authorization codes from DECA. Yes, you can sell your energy drink here, there, or everywhere. But unless you've got sublevel brokers helping you to market these things to the individual commissaries and to the individual exchange platforms, you're not going to get anywhere. And what we found in the earlier action with Mid-Valley is that Monster is affirmatively pressuring, affirmatively exerting its market control over sublevel brokers and then ultimately the master brokers. How many of these broker firms are out there? A very limited number. We don't plead the exact number. Isn't that a problem? I mean, what if there are 20, and you've had run-ins, you said, with four? Well, we also plead that after the last of the four, this Webco bailed on us without any explanation whatsoever, we were unable to find any other brokers to service us. And that's why we were reduced, as I said, to having our own personnel try to service the existing accounts. You plead that your inability to find any others was as a result of actions by Monster? Well, yes. Yeah. Is that in the complaint? Give us the paragraph number, if you would. Beginning paragraph 51, 45. Monster, paragraph 49, once new competitors get on Monster's radar, they effectively preclude them from increasing market share by leaning on the brokers, the master brokers, and the sublevel brokers. Paragraphs 51 and 54, Monster enters into agreements for the purpose of excluding competitors from the market share and it monopolizes the substantial. There's something there that says your ability to deal with every broker is influenced by Monster. Not in those terms, no. And earlier, I didn't stop you then, but you said that you were unable to increase your market share. I didn't see that in a paragraph of the complaint. You say you have trouble making sales, but you were, I guess, emphasizing in your oral statement, your inability to increase market share and, I guess, increase competition. I don't know. And I had not read a word like increase. Am I missing that? I think paragraph 57 probably comes the closest to what your Honor is asking about. We could not find another broker, so we had to go about servicing these accounts ourselves. There's nothing, you know, numerical or quantitative or even directional, except for the several months. You do say was unable to sell any product for several months, but then you go on to say you experienced lost profits as a result of their interference, but you do say that you have continued, in the complaint and in the brief, you had continued to sell at least up to some point. But usually in this kind of an injury to competition, you do say something about prices have gone up or Monster has XDX percent, which has now gone up as a result of its. There's clearly injury to you or you've pled injury to you, but where's the injury to competition? Well, as cases like Les Shockley Racing, a couple of the others indicate, an injury to one competitor, in this case hip-hop, can be co-extensive with injury to competition if the market is very small, discreet, and there are barriers to entry, and I think that's exactly what we've pleaded here. But there are other players besides the defendant, right, that have somehow managed, unlike your client, to survive. And the district court noted that. The district court said if Rockstar Energy Drink and Red Bull down in Asia, if they're able to compete, then that means there is an ability for other businesses to compete. But I think that misses the point, because that's just because in a battle of titans, the two or three major, major players in the market, just because they can survive doesn't mean that they can't. But you haven't told us anything about the relevant market shares of any of the players, so you're asking us to assume way, way too much, it seems to me. Is Munster the largest competitor in the market? We believe so. We think it's over about 50%. But you believe so, but you don't know. You did not even allege that. What if it's Red Bull? I mean, how are we supposed to know this, counsel? Well, you wouldn't know it any more than an individual small manufacturer like hip-hop would know it at the outset of a case like this. It appears to be. I mean, as we indicate in paragraph four, Munster is like one of, if not the biggest player in the energy joint market. Yeah, but how big is big? Are we talking about 25%? Are we talking about 75%? Well, I mean, I guess it clearly is not pleaded with specific percentages, as I said earlier. I mean, there's no getting around what is or is not pled in this. That doesn't mean. If you had sued Red Bull and Munster and Rockstar, you know, you might have a claim here that you had domination of the market by three huge players and might not have to break out each one. But it is noticeable how little actual allegations there are in the complaint. As to market percentages, yes. I guess I would suggest in that vein, if that is the only stumbling block here, we can go back in a minute. I mean, we could do some market research, I suppose. But didn't the judge sort of tell you that first time around? Yeah, you had an opportunity to fix this. No, what the district court said is that based on this Rick Mick Enterprises case, we hadn't pleaded the market power sufficiently. But I think Rick Mick is totally distinguishable from this situation, as are a number of the other cases, both as to injury to competition and then on this market power thing. The cases that the district court relied on, whether they be the pleading cases or the summary judgment cases, all say the plaintiff could have worked around whatever allegedly anti-competitive activity the defendants were accused of. They could have been selling other products. They didn't define the market properly. I don't think the definition of the relevant military market is any longer an issue in this case. It is pretty well defined in the First Amendment complaint. That was not an issue that the district court latched onto in dismissing that First Amendment complaint. What the district court said is, as for market power, well, you know, I referred you to Rick Mick's Enterprises in my first order. I don't think you've pleaded around it. And yet Rick Mick's doesn't really even apply to this situation because Rick Mick says there were ways that the plaintiff could have worked around the defendants' allegedly anti-competitive activity. I guess I would agree with you that you've defined the relevant market just fine in the First Amendment complaint. But the problem remains, it seems to me, that you haven't in any way given us an indication of how Monster exercises market power within that relevant market. And that is something that the district court flagged for you. You apparently gave us the best shot at gathering that the First Amendment complaint reflects everything you've got on that front. So I guess I'm, like my colleagues, I'm wondering why would you get another chance to fix this problem? What we did plead in the First Amendment complaint is that Monster is engaging in its efforts to monopolize the small number of brokers. And that creates the barriers to entry for small manufacturers like Hip Hop. Obviously, we don't attribute a percentage of the market to Monster, Visa V, Red Bull, or any of the other companies. We do say it's a major player, and we do allege that it is trying to monopolize the master brokers and sub-level brokers to squeeze out any entry-level small manufacturers if, as the Mid-Valley representative testified, you get on Monster's radar. So frankly, whether Monster controls 10% of the market or 99% of the market. So you think it's the same in the sense that, again, isn't the ultimate question, is there injury to competition? If Monster has 60% or 99%, that would seem from all antitrust doctrine to make a lot bigger impact on competition that if, as you just said, it was only 10%. If they're squeezing you but they barely make a ripple in the market, where's the antitrust injury? As we allege, it does preclude distribution of small manufacturers' products to the ultimate military consumers and an increase in prices. And in fact, that's what's happening. I thought you'd say that, but it clearly doesn't preclude it because at least until past the complaint stage, you were still selling. We don't know how many other small people are selling. I mean, to be brutal, if it is 60, 19, 19, and everybody else in the world is 2%, that's one effect on competition. If it's 50, 10, 10, and there's 30% being taken by all sorts of little guys, that's completely different. And your linguistics would make either of those two quite possible. Is that fair? No, because the way, as I said, the way it's alleged in the First Amendment complaint, Monster is alleged to be a major player. I mean, it is more than... Well, 60 is big and 50 is big and 40 is big, but that makes a difference, doesn't it? I'm not sure it does if the... So big is all you need to plead? If you're big enough to monopolize all of the relevant broker, master and sub-level brokers that control entry into this military market. You don't allege, for example, that 19 out of 20 brokers only serve Monster or no broker out of the 20 big ones serves anybody except Monster, Rockstar, and Red Bull. You don't allege any of that, right? That's true. We do not allege it. You don't even allege how many there are. I mean, we don't even get to 19 or 20 because you haven't even told us that. That's true. The complaint is what it is. Yeah. It seems defective to me. Thank you. All right. Thank you, Counsel. Counsel, just for your planning purposes, you used your time, but I will allow you a minute for rebuttal. I appreciate that. Thank you. I understand. Thank you, Your Honor. May it please the Court, I'm Joseph Palmore here on behalf of Monster Energy Company. The complaint here suffered from two fundamental flaws. It failed to allege a harm to competition, and it failed to allege that Monster had market power in any relevant market. And the district court's conclusions on both of those are fully sufficient, either one, to justify affirmance here. First, on the harm to competition, there are two related defects in the complaint. First, Hip Hop alleges harm only to itself. It doesn't name any other energy drink producer that encountered these difficulties. It's complaining about. To the extent it talks about other competitors at all, it identifies two, Rockstar and Red Bull, that actually are competing in the market. So the only allegations in the complaint are about harm to Hip Hop and this court's cases. Counsel, one of the things that just sort of surprised me is, you know, it just seems to me that there's a lot of discussion of commercial marketing, commercial success. And I'm surprised that the Wall Street Journal or somebody, Businessweek, somebody hasn't done an article and said, gee, you know, this is a ‑‑ there are three big players in this market, and they control roughly 75 percent or 60 percent. This seems to me that this should have been known someplace. Well, one would think, and that was actually in Rick Mick, which is a case that affirmed a dismissal on the pleadings for failure to properly and plausibly allege market share. This court pointed that out as a defect. Like I said, the complaint nowhere gives any market share percentages. The complaint here is bereft of that. It doesn't name any other, you know, it doesn't say how many brokers there are or name them. It doesn't identify other small energy drink producers, much less say that they've encountered this kind of problem. It doesn't talk about how many brokers or subbrokers there are. It doesn't talk about pricing information, which would be very public. It's completely bereft of any of the kind of specifics of how this market works that would lead to a plausible claim of harm to competition. Even if HIPHOP had alleged harm to other competitors, which it didn't, it doesn't allege that there was a substantial foreclosure of competition, and that's the key. If you look at Les Shockley Racing, again, which is a 12B6 dismissal, there the plaintiffs were eight separate competitors, and their claim was they were completely barred from the relevant market. And this court affirmed dismissal of the complaint in that case because it said it was disturbingly, what was disturbingly absent wasn't any allegations about other players in the market and whether or not and how they were accessing it. Here, too, the complaint doesn't have any information about any competitor other than HIPHOP, with the exception, again, of Rockstar and Red Bull that are competing. So for all those reasons under Les Shockley Racing and related cases, the complaint doesn't plausibly allege a harm to competition. But there's a separate defect, which is that it doesn't plausibly allege that Monster has market power, and that's an indispensable element of all the antitrust claims here. And to establish market power in a case like this using circumstantial evidence, which is, I take it, what HIPHOP was trying to do, there are a number of required elements. One is that the defendant have a dominant share in the market. Two, that there are barriers to entry. And three, that the existing competitors couldn't ramp up production in order to offset any decline in production and to offset any super competitive pricing that Monster tried to engage in. None of that is here. On market share, the complaint simply alleges that Monster has a significant percentage. We have no idea what that means. Is it 10 percent? Is it 20 percent? There are no specifics there at all. So that's not an adequately pledged allegation. But also, and critically, there is no allegation here that the existing competitors, which the complaint names and identifies and calls them entrenched, couldn't ramp up production in order to offset any super competitive pricing that Monster tried to engage in in this market. And that is, again, that's fully adequate. The absence of that kind of allegation, even a conclusory allegation, much less a specific one, that the existing competitors couldn't increase production to offset higher prices is fatal to this complaint. So does that mean at least under the doctrine that if you have three competitors who are not conspiring, who are competing hammer and tongs, and you're a fourth outsider, in effect, for antitrust purposes, it's okay to squeeze out that fourth outsider because the other three are adequately preserving competition? If there's no harm to competition in the sense of harm to consumer welfare through the charging of super competitive pricing, then yes, exactly right, Judge Boggs. The three things you said, and forgive me, I just may not have heard it stated or had it down, they don't allege dominant market share, then there was a second, and then the third was others can't raise production. What was the second? Barriers to entry. Barriers to entry, okay. Barriers to entry. So Rebel Oil, this Court's decision in Rebel Oil is quite instructive on this. In Rebel Oil, I think the defendant there had a 44% market share. It was pretty significant. There were barriers to entry, but the Court nevertheless said there was no antitrust claim because there was no showing that the existing competitors couldn't ramp up production to offset a decline in output by the defendant. Here, too, the same is the case. So they need to allege all three from your point of view? Yes, Your Honor. I believe they do. And on the leave to amend question, as some of this Court's questions reflected, the district court here looked at the first complaint, identified these same two defects that we've talked about this morning, failure to allege harm to competition, failure to allege market power, cited the relevant cases that pointed HIPPOP to what it needed to do. HIPPOP amended the complaint and didn't make any relevant changes to the complaint to respond to the very specific defects that the district court had identified for it. And the district court said this in its order and said, Look, I gave you a chance. I provided a roadmap. You didn't follow it. The situation here is just like in Rutman Wine, which is, again, a 12B6 case where this Court affirmed a dismissal for failure to state a claim, for failure to allege harm to competition. There, like here, there had been an initial complaint that was dismissed for failure to properly allege harm to competition. There, like here, the plaintiff had filed an amended complaint that hadn't corrected the defect. And there, like here, the district court dismissed with prejudice. And this Court said there was no abuse of discretion in reaching that conclusion. So I think that here the dismissal was proper for those two independent reasons, and the Court did not abuse its discretion by denying HIPPOP yet another chance to try to correct these defects. If there are no other questions, we'd ask that the judgment be affirmed. Thank you, Mr. Palmore. Mr. Mertens. Very briefly. The Rebel Oil and the Rick Mix prong that was just articulated as the third requirement of, you know, we have to plead, we can't work around a pricing issue, that's really not the issue in this type of case. Both Rick Mix and Rebel Oil focused on pricing and the fact that the plaintiffs could work around it by increasing production and whatnot. That's not even an issue in this case. In paragraphs 34 through 46, and again in paragraph 47 of the First Amendment complaint, we expressly plead the adverse effects of Monster's anti-competitive activity. By foreclosing us from these master and sub-level brokers, we simply cannot further our accounts that we already had. We can't penetrate the market further. The idea that we're supposed to plead something about working around a pricing arrangement, that's really an irrelevant non sequitur for purposes of this case. We have alleged that Monster is a dominant player in this industry. It is attempting to monopolize all the brokers. We provide specific examples with specific discovery evidence from another case that indicates that Monster is engaging in an anti-competitive arrangement with these brokers once small manufacturers get on their radar. And I think that for purposes of a pleading matter under 12B6, that would be sufficient. Thank you. Okay. Thank you, Mr. Martins. We thank counsel for the argument. Hip Hop Beverage v. Monster is submitted.
judges: Boggs, Bybee, Watford